Luis Martínez Gelabert, demandante y apelado, *v.* El Municipio de Río Piedras, demandado y apelante.

Núm. 8848.—*Sometido:* Junio 13, 1944. *Resuelto:* Noviembre 24, 1944.

*E. Acosta Domenech,* abogado del apelante; *José Benet,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

El Municipio de Río Piedras ha poseído por más de sesenta y ocho años en concepto de dueño un edificio de mampostería que hasta hace cuatro años dedicó a matadero municipal. El solar donde existe el edificio formaba parte de una finca rústica de nueve cuerdas, cuyo posesión fué inscrita a favor de Juan Ubarri Capetillo mediante expediente posesorio tramitado en el juzgado municipal de Río Piedras en el año 1884. Una parcela segregada de la finca de nueve cuerdas fué recientemente urbanizada, figurando el solar donde enclava el matadero con el número veinticinco en el plano de urbanización. Tras sucesivas enajenaciones, este solar fué adquirido por Alejandrina Blanco, quien por escritura de 5 de marzo de 1942 lo vendió a Luis Martínez Gelabert. El municipio mantiene aún en el solar las ruinas del matadero, y alega que tanto el edificio como el solar son de su propiedad, a título de compra y por haberlos poseído en concepto de dueño, pública, pacífica e ininterrumpidamente desde el año 1854. Aunque Luis Martínez Gelabert expresamente admite que el edificio en ruinas pertenece al municipio, sostiene que el solar es de su exclusiva propiedad por haberlo adquirido de Alejandrina Blanco, quien tenía inscrita su posesión en el registro de la propiedad. A fin de dirimir la controversia, Martínez Gelabert instó este pleito en la corte inferior solicitando una sentencia que lo declare dueño del solar y condene al demandado a remover las ruinas del edificio. Alegó el demandante que según información obtenida después que él compró el solar, uno de los anteriores dueños de la finca de nueve cuerdas, cuyo nombre no ha podido comprobar, consintió y toleró hace más de treinta años, sin que mediara compensación alguna, que el demandado construyera el edificio mencionado con el único propósito de dedicarlo a matadero público; que movidos por un alto espíritu cívico los posteriores dueños consintieron que el ma-

tadero público continuara en el solar, hasta que en el mes de abril de 1937, en que Jesús Blanco Larresca y sus hijos, como dueños de la parcela donde está comprendido el solar, resolvieron urbanizarla, prometiendo entonces el demandado remover el matadero tan pronto hubiera construído otro; que desde el mes de agosto de 1940 el municipio está usando un matadero que construyó en otra finca, abandonando desde entonces el viejo matadero pero negándose a remover el edificio, sosteniendo que es dueño del solar; que el solar en controversia tiene un valor de $1,968.96; y que el demandante, al igual que los anteriores dueños, han pagado las contribuciones impuestas al mismo.

El municipio negó que el demandante sea dueño del solar, que haya estado en su posesión y que esté pagando contribuciones sobre el mismo. Alegó afirmativamente que el inmueble le pertenece por haberlo adquirido a título oneroso y haberlo poseído en concepto de dueño por espacio de 88 años sin haber sido perturbado en la posesión. Concluye el demandado solicitando sentencia que lo declare dueño en pleno dominio del solar, y que se expida mandamiento al registrador de la propiedad para que cancele la inscripción practicada a favor del demandante.

No existe la más insignificante evidencia tendiente a probar la contención del demandante al efecto de que el demandado edificó en el solar por mera tolerancia o permiso de una de las personas de quien trae causa el demandante. El propio demandado tampoco ha podido dar luz alguna sobre la fecha y condiciones en que empezó la posesión del municipio y se construyó el matadero, ni aparece en los archivos municipales documento alguno que pueda suministrar información sobre este extremo. Es verdad que el acta de la Junta Municipal de Río Piedras de fecha 23 de febrero de 1854 (exhibit 1 del demandado) acredita que en ese día, reunida la junta para considerar las proposiciones que para "optar a la plaza de carnicero se presentaron," las dos más

ventajosas fueron la de Ramón Trigo y la de Francisco Cruz. Este último, según se hace constar en el acta, entre otras cosas ofrecía, mediante cierta remuneración, construir por su cuenta un edificio de madera, obligándose a traspasarlo al municipio con sus útiles, así como la propiedad del terreno que ocupara el matadero. No aparece del acta, sin embargo, que esa proposición fuese aceptada, y aunque lo hubiera sido, no consta el sitio donde habría de construirse el matadero, existiendo además la diferencia de que el que se proponía construir Francisco Cruz era de madera, mientras que el edificio a que se refieren las alegaciones de este caso es de mampostería, lo cual tiende a demostrar que el actual edificio no es el que se menciona en el acta. No existe, pues, evidencia alguna de cómo el municipio comenzó a poseer el solar. El conocimiento más remoto que sobre este punto tenemos lo debemos a José Martínez Llonín, testigo del demandado, quien declaró que vino a vivir a Río Piedras en 1878 ó 1879, y que en esa fecha el matadero actualmente en ruinas existía ya en el solar en controversia.

Veamos ahora los actos de dominio que pretende el demandante han ejercitado sus causantes sobre el solar:

1. Que siendo Jesús Blanco Larresca dueño de la parcela de la cual era parte el solar, y siendo Joaquín Emanuelli alcalde de Río Piedras, el municipio, en consideración al uso del solar, mandaba por su cuenta a regar el estiércol que se acumulaba en el matadero en los sitios de la finca que le indicaba Blanco, y además suministraba el agua para la lechería que Blanco tenía establecida en el resto de las nueve cuerdas;

2. Que el alcalde Emanuelli en cierta ocasión trató de construir una ampliación en la parte de atrás del edificio, y Blanco Larresca le manifestó que no quería que la construyese en aquel sitio, por lo que el alcalde hizo la ampliación donde le indicó Blanco, en la parte delantera;

3. Que el municipio autorizó el plano de urbanización sin protesta alguna, a pesar de que en el sitio correspondiente al solar veinticinco se consignaron las palabras "matadero a remover";

4. Que al tramitarse el expediente posesorio el municipio expidió una certificación acreditativa de que la Sucesión Ubarri pagaba las contribuciones impuestas a la finca de nueve cuerdas objeto del expediente;

5. Que los señores Blanco, sin protesta del municipio, cortaban y utilizaban el malojillo que crecía en el solar del matadero; y que Alejandrina Blanco, quien compró el solar el 25 de octubre de 1941, algunas veces mandó a limpiarlo; y

6. Que el testigo Blanco, antes de vender el solar a su hermana Alejandrina, lo cercó personalmente, haciendo los hoyos y poniendo los espeques.

■ Angel Blanco, condueño de la urbanización y único testigo del demandante que declaró sobre el supuesto pago por el uso del solar, a preguntas de la corte declaró:

"P. ¿El municipio pagaba a ustedes algo por el uso? R. Sí, señor.

"P. ¿Cuánto les pagaba? . . .

" . . . R. Nos regaba el estiércol y nos daba agua a la finca.
" " *          *          *          *          *          *          *

"P. ¿Hubo alguna ordenanza a ese respecto? R. En cuanto a ese respecto no puedo decirle.

"P. ¿Pero le instalaron una tubería para regar la finca? R. Para regar la finca no, . . . daban agua gratis a la lechería y el estiércol lo regaban dentro de la finca.

"P. ¿A cambio de qué? R. A cambio de la posesión que tenían del matadero."

Y más adelante, a repreguntas del abogado del demandado, declara:

"P. ¿Y usted dice que nunca hubo ningún escrito sobre el convenio para esas cosas que usted menciona? R. No, señor. Yo sé que hubo pleitos y demás.

"P. ¿Qué pleitos hubo? R. Bueno, yo sé que hubo pleitos con el municipio sobre eso.

"P. ¿Pero pleitos en la corte? R. No sé. Yo sé que el municipio daba el estiércol.

"P. ¿Pero hubo pleitos en la corte? R. Yo no recuerdo. Yo he oído decir que hubo pleitos.

"P. ¿De manera que lo que usted está hablando aquí es lo que ha oído decir? R. En cuanto a los pleitos, sí.

"La corte: Que se elimine entonces."

Y luego, refiriéndose al suministro de agua, declaró:

"La corte: Se aclaró que . . . no era dueño el municipio del acueducto, sino que el Municipio de San Juan surte el Municipio de Río Piedras, según admite el letrado del demandante. ¿Es un hecho cierto que suministraba el agua? R. Sí, señor.

"P. ¿Ustedes no pagaban por esa agua? R. No, señor.

"P. ¿No pagaban por tolerancia o por algún convenio? R. Yo supongo que había un convenio.

"*          *          *          *          *          *          *

"P. Que usted sepa, personalmente, ¿no convinieron nada con el municipio sobre eso, que usted recuerde? R. *Bueno, que yo recuerde, el municipio siempre regaba ese estiércol dentro de la finca y le daba agua.*" (Bastardillas nuestras.)

Aceptando como cierta la declaración del testigo Blanco en cuanto al extremo indicado, veremos que su declaración se reduce a que, según su recuerdo, el municipio siempre regaba el estiércol dentro de la finca y le daba agua. Esa actuación por parte del municipio no implica necesariamente que esos actos fuesen realizados en pago del uso del solar. El municipio tenía en el solar, no sólo el edificio del matadero si que también un ranchón donde encerraba el ganado que había de sacrificarse al día siguiente, una extensión de concreto donde acumulaba el estiércol, y los pozos negros donde desaguaban los desperdicios. Era indispensable retirar de allí el estiércol para mantener el matadero en condiciones sanitarias. Ese estiércol que resultaba una molestia para el municipio era beneficioso para la finca de los señores Blanco colindante con el solar. Ningún sitio más conveniente para el municipio botarlo que la finca de los señores Blanco. El suministro del agua podría racionalmente inter-

pretarse como una remuneración por permitirle botar el estiércol en la finca.

El mismo testigo Blanco es quien declara que el alcalde Emanuelli, obedeciendo órdenes de Blanco Larresca, al ampliar el matadero lo hizo en el sitio designado por dicho señor. Suponiendo que el testigo presenciara esa conversación entre el alcalde y su padre, ese mero incidente con el alcalde no puede considerarse como una admisión que obligue al municipio.

El hecho de que el municipio autorizara sin protesta el plano de urbanización en el cual, en el sitio correspondiente al solar del matadero, se consignó "matadero a remover," en nada perjudica la posesión del municipio. Tanto el demandante como el demandado sostuvieron que el matadero estaba en malas condiciones y que el municipio se proponía construir en otra finca un edificio para matadero, como en efecto lo hizo. Y el propio alcalde Landrau a ese efecto declaró que el municipio no tuvo inconveniente en aprobar el plano porque tenía el propósito de remover el matadero y no creyó que las palabras "matadero a remover" pudieran interpretarse como que el municipio cedía el solar a la Sucesión Blanco ni a ninguna otra persona; y que de haber sospechado que la intención de los Blanco al consignar esas palabras en el plano era apoderarse del solar, ni él ni la asamblea lo hubieran autorizado. Manifestó además que trasladaban el matadero a otro sitio porque el solar resultaba ya pequeño y el sitio no era adecuado porque sus alrededores estaban urbanizados; que el matadero viejo fué construído cuando en Río Piedras se sacrificaban tres o cuatro reses, mientras que a la fecha en que se construyó el nuevo se sacrificaban 16, 20 y 30 reses diarias; y que el municipio tenía el propósito de edificar una cárcel municipal en el solar en controversia.

Aceptando que en el año 1884, fecha en que se tramitó el expediente posesorio, Juan Ubarri Capetillo figurase

pagando la contribución sobre el predio de nueve cuerdas, nos encontramos con que desde el año 1884 en que se expidió esa certificación hasta el año 1942, en que se presentó la demanda de este pleito, transcurrieron 58 años, durante los cuales no se ha acreditado que los causantes del demandante hayan pagado contribución sobre el solar en controversia. Es verdad que en el acto del juicio el demandante ofreció en evidencia un documento para probar que pagaba contribución sobre el solar, pero la corte no lo admitió por entender que en el referido documento no se identificaba el solar a que se refería la contribución pagada, y no habiéndose solicitado que el documento fuese marcado como evidencia ofrecida y admitida, no cónsta en los autos de esta apelación.

■ Tampoco perjudica la posesión del municipio el hecho de que exista prueba por parte del demandante al efecto de que alguno de sus causantes cortase el malojillo que crecía dentro del solar ocupado por el matadero. El solar era dedicado a matadero, y el malojillo que pudiera crecer en ese solar, lejos de beneficiar, más bien perjudicaba al municipio, de manera que el permitir que se cortase el malojillo puede interpretarse como mera tolerancia por parte del municipio, que no lo necesitaba, y no como un reconocimiento de propiedad sobre el solar a favor del causante del demandante.

■ La declaración del señor Blanco con respecto a la cerca del solar fué contradicha por el alcalde Landrau, quien manifestó que el solar no se cercaba nunca porque no era necesario toda vez que el ganado estaba encerrado en el ranchón de que se ha hecho mérito. El propio testigo Blanco en repregunta admitió que no existía vestigio alguno de tal cerca hecha por él. Pero suponiendo que Blanco hubiera cercado el solar en alguna ocasión, no vemos cómo este acto, que no era adverso a la posesión del demandado hubiera podido perjudicarla, a menos que al establecer la cerca se privase al municipio de alguna parte del solar.

Examinemos ahora la declaración de José Benet, abogado del demandante. Declaró que contrajo matrimonio en 1938 con Alejandrina Blanco; que desde su matrimonio, su esposa le otorgó un poder general e inmediatamente intervino en los asuntos de los hermanos Blanco como si fuera uno de los condueños de la finca; y que se hizo cargo de hacer la urbanización con el ingeniero Julio Marrero. La declaración del señor Benet, lejos de fortificar la de su cuñado Angel Blanco, más bien la debilita, pues tiende a demostrar que los hermanos Blanco no estuvieron seguros de su condición de dueños del solar hasta que en 1941 el señor Benet, en compañía del secretario municipal, hizo una búsqueda en los archivos del municipio para cerciorarse de si el municipio tenía o no título escrito del solar. A este efecto dice el testigo:

". . . personalmente estuve con el secretario municipal en el 1941, a principios del 42, buscando si había algún documento perteneciente al municipio en los archivos ·. . . y no había ninguno. *Entonces fué que se resolvió vender el solar.* Después doña Alejandrina estuvo algún tiempo con el solar y luego se lo vendimos a don Luis Martínez Gelabert. Don Luis Martínez Gelabert vino a Río Piedras, yo lo llevé a ver los documentos, le enseñé el Registro de la Propiedad, no había carga ni gravamen sobre eso. *Lo llevé sobre el terreno* y tomó posesión del terreno." (Bastardillas nuestras.)

Repreguntado el abogado Benet si recordaba haber estado con el abogado del municipio, Acostá Domenech, en el solar en cuestión y si hubo oposición a que Benet cercara el solar, contestó:

"Bueno, nosotros no estábamos cercando, ya estaba cercado. La oposición que me dijo el compañero fué . . . que no tocase ese edificio del matadero ni el terreno porque ellos decían que eran de ellos; entonces yo le dije al compañero, 'Pues eso nosotros lo hemos comprado,' y entonces acordamos el compañero y yo que trajéramos el caso aquí a la corte para que la corte dijera quién era el dueño porque no podíamos ponernos de acuerdo.

"P. ¿Hubo oposición a que ustedes tomaran posesión en alguna forma? R. Sí, hace como seis u ocho meses."

Si como alegó el demandante el uso del solar lo obtuvo. el municipio por mera tolerancia o por permiso de uno de los anteriores dueños, sin poder precisar cuál; si según el testigo Angel Blanco, su padre y él mismo habían ejercitado actos de dominio que habían sido acatados y respetados por el municipio, tales como la construcción de la ampliación del matadero y el corte del malojillo, ¿por qué suponer que el municipio tuviese título escrito sobre el solar, y no estar satisfechos de que eran dueños del solar hasta que la búsqueda les demostró que no existía título escrito en el archivo municipal?

Del *exhibit* 3 del demandante resulta que antes que él y su causante Alejandrina Blanco, diez distintos dueños, entre los cuales se hallaban algunas sucesiones como las de Juan Ubarri Capetillo y Jesús Blanco Larresca, compuesta de varias personas, poseyeron el predio de nueve cuerdas donde enclava el solar. Y es muy significativo que hasta el año 1941, cuando Alejandrina Blanco adquirió título sobre el solar, a ninguno de los anteriores dueños se les hubiera ocurrido hacer valer sus derechos ante el municipio, ya exigiendo la remoción del edificio o que el demandado pagase el precio del solar o el correspondiente canon de arrendamiento. Es también significativa la circunstancia de que en la misma escritura en que el demandante compró el solar por $700.15, constituyese sobre el solar una hipoteca para garantizar un pagaré al portador por ochocientos dólares de principal y dos créditos adicionales, uno de cien dólares para intereses y otro de doscientos dólares para costas y honorarios en caso de reclamación judicial. No creemos que el demandante pudiese racionalmente esperar que alguien le prestase ochocientos dólares con la garantía de una finca que acababa de comprar en $700.15. Y si en verdad el solar, como se alega en la demanda, tenía un valor de $1,968.96, es también significativo que el abogado Benet y su esposa lo vendieran por $700.15.

■ El análisis que acabamos de hacer de la prueba nos lleva a la conclusión de que el municipio por más de sesenta y ocho años ha venido poseyendo en concepto de dueño el solar en controversia pública, pacífica e ininterrumpidamente.

■■ Establecida esta conclusión, nos hallamos frente a dos posesiones simultáneas: la del demandante y sus causantes, que podríamos llamar simbólica porque sólo ha existido en los libros del registro de la propiedad; y la del demandado, que podríamos llamar de hecho porque ha existido en la realidad. Ahora bien, ¿cuál de las dos debe prevalecer a los efectos de producir la adquisición de dominio por prescripción?

Siendo la finalidad fundamental de la Ley Hipotecaria la protección de tercero, no podía dejar a éste indefenso y por eso dispuso en el primer párrafo de su artículo 35 que "La prescripción que no requiera justo título no perjudicará a *tercero* si no se halla inscrita la posesión que ha de producirla." (Bastardillas nuestras.) Empero el dueño que tiene inscrita la posesión de un inmueble, ya fuere el que inscribió mediante expediente posesorio, ya el último que haya adquirido a título oneroso o lucrativo o cualquiera de los dueños intermedios, no tiene la condición de tercero que contempla el último párrafo del citado artículo, que dice: "En cuanto al dueño legítimo del inmueble o derecho que se esté prescribiendo, se calificará el título y se contará el tiempo con arreglo a la legislación común."

Manuel Dorta Duque, en su obra titulada Curso de Legislación Hipotecaria, pág. 297, explicando el alcance del artículo 35 de la Ley Hipotecaria de Cuba, idéntico al 35 de la nuestra, dice:

"El dominio es un derecho real que implica necesariamente una relación material con el inmueble, la que se realiza por la posesión ostensible y pública; en cambio la hipoteca no es sino una simple relación jurídica, a los efectos de asegurar o garantizar, en su día, el cumplimiento de una obligación principal. Luego, es justa la solución del legislador cuando declara que la prescripción perjudicará

al que adquiera a título de dueño un inmueble, porque frente a éste, la posesión actúa de manera ostensible y evidente; pero que, en cambio, no perjudicará, si no está inscrita la posesión o el título, por ejemplo, al acreedor hipotecario, porque a éste no le afectan, ni por ende, pueden perjudicarle, los actos posesorios de un tercero. Al que adquiera el dominio le interesa la relación posesoria, y si ésta corresponde a otra persona distinta de la que aparece en el Registro —como que para producir efecto en la prescripción la posesión tiene que ser pública—, no puede el titular del dominio ampararse en la inscripción, alegando desconocer o negar los actos necesariamente ostensibles de la posesión.''

Y Morell, en su obra Legislación Hipotecaria, volumen 2, pág. 656, comentando el mismo artículo de la Ley Hipotecaria española, dice:

''Nosotros creemos que el artículo 35 debe ser interpretado con arreglo a sus palabras, y puesto que no distingue, tan dueño del inmueble o derecho real es el que lo fuese al empezar la prescripción, como el que lo fuese al fin, y ya hubiera adquirido por título lucrativo o por título oneroso. Todos ellos, además, se hallan en iguales circunstancias; todos, así el primero, como el último, como el intermedio, deben saber quién posee sus fincas y por qué las posee, y son igualmente responsables de su abandono. Considera la ley, dice Escosura, y lo aceptamos nosotros, tanto al dueño como al poseedor, como dos representaciones únicas; la de aquél, compuesta de todos los dueños que han tenido derecho sobre la finca; la de éste, de todos los poseedores que sucesivamente la han gozado y disfrutado; el último dueño sufre los efectos de las negligencias propias y de los descuidos de los dueños que le han precedido, así como el último poseedor reúne en sí todos los derechos que sucesivamente han ido adquiriendo por la posesión los que antes que él poseyeron.''

Y por último, como decía la Serna, ''El que viendo una finca suya poseída por otro que carece de título para tenerla, calla, sólo puede decirse engañado por su negligencia. No debe quejarse de que una ley hecha con diferente objeto, no venga en su auxilio.'' [1]

En el mismo sentido se pronuncian Galindo y Escosura, en su obra Legislación Hipotecaria, volumen 2, págs. 411 *et*

---

[1] Esta cita aparece en la obra de Galindo y Escosura, Legislación Hipotecaria, volumen 2, pág. 411.

*seq.*, y las sentencias del Tribunal Supremo de Cuba de 3 de noviembre de 1906, 22 de noviembre de 1913, 24 de noviembre de 1915 y 21 de noviembre de 1935.

Pero no obstante lo dispuesto en el último párrafo del artículo 35 de la Ley Hipotecaria, el demandante en el presente caso nunca hubiera podido invocar la condición de tercero, puesto que como hemos visto, antes de él comprar estuvo en el solar acompañado del abogado Benet y vió allí el edificio que, aunque en ruinas, ocupaba el solar, enterándose a la vez que dicho edificio no pertenecía a la vendedora, lo cual debió poner en guardia al demandante con respecto al título que sobre el solar pudiera tener el municipio.

A nuestro juicio la corte sentenciadora cometió manifiesto error en la apreciación de la prueba, error que según aparece de la opinión fué en gran parte motivado por haber sido impresionado el juez por la circunstancia de que tanto el demandante como sus causantes tenían inscrita a su favor la posesión del solar.

*Procede la revocación de la sentencia y en su lugar dictar otra declarando que el Municipio de Río Piedras es dueño del solar descrito en el segundo párrafo de la demanda, sin perjuicio de los derechos que pueda tener el tenedor del pagaré al portador garantizado con la hipoteca constituída sobre dicho solar por el demandante y su esposa por escritura veintidós de 5 de marzo de 1942 ante el notario Miguel Rodríguez Alberty, por no haber sido parte en este pleito el acreedor hipotecario, debiendo cancelarse la inscripción practicada a favor del demandante. Deben imponerse las costas al demandante.*